# IN THE DISTRICT COURT OF THE UNITED STATES
# FOR THE WESTERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

    -vs-

GREGORY TROTTER,

                  Defendant.

**DEFENDANT'S
SUPPLEMENTAL
RULE 29 MOTION**

24-CR-60-LJV-JJM

In addition to the arguments and authorities in Detective Trotter's original Rule 29 motion (Dkt. 112) and those placed on the record on September 8, 2025 in support of that motion, Detective Trotter offers the following additional arguments and authorities in support of his motion for a judgment of acquittal.

To prove a violation of 18 U.S.C. § 1001 as charged in the superseding indictment (Dkt. 46), the government was required to prove from all of the evidence in the case beyond a reasonable doubt, that:

1. On or about September 30, 2022, the defendant made a statement or representation;

2. This statement or representation was material;

3. The statement or representation was false, fictitious, or fraudulent;

4. The false, fictitious, or fraudulent statement was made knowingly and willfully; and

5. The statement or representation was made in a matter within the jurisdiction of the government of the United States.

1

The government alleged in the superseding indictment that Detective Trotter made three distinct false statements in violation of 18 U.S.C. § 1001, namely that

1. The defendant denied having contact with Gerace after January 2017;

2. The defendant stated that his involvement in the investigation into the alleged theft of Gerace's Rolex watch was limited to taking a statement from Gerace; and

3. The defendant stated that Gerace had never reached out to him or contacted him regarding the [Rolex watch] investigation.

Insofar as relevant to this motion, the Court instructed the jury on the elements of 18 U.S.C. § 1001 as follows:

### COUNT 1: ELEMENT 3 – FALSE, FICTITIOUS, OR FRAUDULENT STATEMENT

THE THIRD ELEMENT OF **COUNT 1** IS THAT THE STATEMENT OR REPRESENTATION WAS FALSE, FICTITIOUS, OR FRAUDULENT. A STATEMENT OR REPRESENTATION IS "FALSE" OR "FICTITIOUS" IF IT WAS UNTRUE WHEN IT WAS MADE, AND IF THE PERSON MAKING IT OR CAUSING IT TO BE MADE KNEW AT THE TIME THAT IT WAS UNTRUE.

A STATEMENT OR REPRESENTATION IS "FRAUDULENT" IF IT WAS UNTRUE WHEN IT WAS MADE AND IF IT WAS MADE OR CAUSED TO BE MADE WITH THE INTENT TO DECEIVE THE GOVERNMENT AGENCY TO WHICH IT WAS SUBMITTED.

IF THE STATEMENT OR REPRESENTATION WAS MADE IN RESPONSE TO A QUESTION, AND IF THE QUESTION WAS AMBIGUOUS SO THAT IT

2

REASONABLY COULD BE INTERPRETED IN SEVERAL WAYS, THEN THE
GOVERNMENT MUST PROVE THAT MR. TROTTER'S ANSWER WAS FALSE
UNDER EVERY REASONABLE INTERPRETATION OF THE QUESTION.

The Court further instructed that:

**COUNT 1: ELEMENT 4 – KNOWING AND WILLFUL CONDUCT**

THE FOURTH ELEMENT OF **COUNT 1** IS THAT THE STATEMENT OR
REPRESENTATION WAS MADE KNOWINGLY AND WILLFULLY.

AN ACT IS DONE KNOWINGLY IF IT IS DONE PURPOSELY AND
VOLUNTARILY, AS OPPOSED TO MISTAKENLY OR ACCIDENTLY.

AN ACT IS DONE WILLFULLY IF IT IS DONE WITH AN INTENTION TO DO
SOMETHING THE LAW FORBIDS, THAT IS, WITH A BAD PURPOSE TO DISOBEY THE
LAW.

Detective Trotter contends that no rational juror could have found either or both of
these elements based on the proof presented at trial. The grounds upon which to grant
defendant's Rule 29 motion with respect to each allegation are addressed separately below.

**First allegation: The defendant denied having contact with Gerace after
January 2017**

The government's trial proof, primarily government Exhibit 1, the recording of
Detective Trotter's (GT) conversation with Special Agent Kammeraad (JK), and Exhibit
1TX, the transcript of that recorded conversation, established that on or about September 30,
2022, the Detective Trotter did not make the statement charged in the superseding
indictment.   The statement referenced by this allegation is found at Exb. 1TX, 24; Exb. 1,
approx. 33:45:

GT:    The first time I talked to him he's he's name dropping everybody. But this was … this started in July 2016. I think my last interaction with ==them== was January of 2017.

JK:    Okay

GT:    But then she, you know, she had drama after that, but nothing that I was involved in.

        Earlier versions of Exhibit 1TX transcribed the same statement as:

GT:    The first time I talked to him he's he's name dropping everybody. But this was…this started in July 2016. I think my last interaction with ==him== was January of 2017.

    The context of the conversation makes clear that "them" refers to Peter Gerace, Katrina Nigro, and their domestic disputes that resulted in the Amherst Police Department's involvement during their divorce. In that context, the last time Detective Trotter had contact with "them" was in 2017, just as he reported (*see* Exb. 1TX, 30 [final police report filed by Katrina Nigro in 2017]).

    Equally clear from the context of the recording and transcript is that Detective Trotter never claimed that his last contact with "him" – Peter Gerace – was in 2017. Rather, he went on to describe his contacts with Gerace during, for example, the Rolex watch theft investigation in 2019.

    Thus, the grand jury charged Detective Trotter with making a statement that according to the government's proof, he did not make. The Court should therefore grant the defendant's Rule 29 motion relating to this statement because no rational trier of fact could find the essential elements of the crime established beyond a reasonable doubt (*United States*

*v. Cacace*, 796 F.3d 176, 191 [2ⁿᵈ Cir. 2015]; *United States v. Moore*, 54 F.3d 92, 100 [2ⁿᵈ

Cir. 1995]).

> **Second allegation: The defendant stated that his involvement in the investigation into the alleged theft of Gerace's Rolex watch was limited to taking a statement from Gerace**

Defendant's initial statements relative to this allegation were:

JK:    What was your involvement in that case? Cuz I thought I did see your name in some of the reports….

GT:    Uh, my involvement in that was we had to go to Peter's house and have him sign a victim statement.

(Exb. 1TX, 46; Exb. 1, approx. 57:20). Then:

GT:    . . . I I mean I vividly remember going over to his house.

JK:    For that victim statement.

GT:    To have him sign that….

JK:    Right..

GT:    Sign that statement, but again it wasn't my case. So I didn't really have any involvement in it. *I… I truly don't remember.*

(Exb. 1TX, 48; Exb. 1, approx. 59:00 [emphasis added]). And finally:

JK:    And just make sure that I've covered everything. Uhm….. When when was the last time that you either saw or spoke with Peter?

GT:    That day at his house in Clarence.

JK:    That's the last time?

GT:    *I'm almost positive, yeah.*

(Exb. 1TX, 49; Exb. 1, approx. 59:55 [emphasis added]).

As a threshold matter, viewing Detective Trotter's responses to the agent's questions in the context of the entire conversation, the detective did not claim that the *only* thing he did during the investigation was take Gerace's statement. He did not exclude or rule out other actions, and in fact, went on to describe additional involvement later in the conversation. Further, as early as these initial statements, Detective Trotter acknowledged his failure of memory, qualifying his statements and questioning the accuracy of his recall. In the remainder of his responses to the agent's questions on this topic, Detective Trotter himself modifies, undercuts, and further calls into question his original guesses regarding the extent of his involvement based on his admittedly imperfect recollection.

For example, almost immediately after the above statements, Detective Trotter went on to describe further participation in the investigation: he recalled viewing pictures of the stolen Rolex sent from the pawn shop in Las Vegas where it was found (Exb. 1TX, 61) and recalled identifying information about the watch – the band being the wrong size or type (Exb. 1TX, 62).

When responding to questions about the arrest of Phylica Hunt for the theft of gerace's watch, Detective Trotter was similarly unclear and contradictory regarding the extent of his involvement, first denying any involvement, then being unable to recall his involvement, then asking the agent (or himself, out loud) if he was there, then agreeing that based on the circumstances he must have participated in the arrest, although he had no present recollection of doing so. For example:

6

JK:    Okay, uhm, and you said you went with Jeff Gilbert, right?

GT:    Yeah.

JK:    To arrest her.

GT:    *No, I… did I go with him to arr… I I ….*

JK:    I can't remember.

GT:    *I don't remember.* I think she…

JK:    It's it's not…. It's not pertinent. . .

(Exb. 1TX, 58; Exb. 1, approx. 1:11:30 [emphasis added]).

GT:    *Uhm, well now you have me thinking about this. I don't even remember was she in town?*

JK:    I think she was out of town. She was out of…

GT:    *Did she get extradited?*

JK:    No, from what I remember from the police reports . . . you guys went and picked her up. But I didn't know… there was no indication of how you knew where she was to pick her up.

GT:    *I honestly don't remember any of that. I don't even remember picking her up. Was I there?*

JK:    I think…I think the booking… you were.. your signature's on it. That's the only way I knew your involvement. That's why I'm asking. I don't know if it was. I believe you were some… On something for …some kind of document for booking. Or maybe I could be wrong…

GT:    *Then I must have been there.* We, I mean…

JK:    Uhm, He would drop…

GT:    *I truly do not remember going to pick her up.*

JK:     But, uhm, Jeff wouldn't have went by himself, right?

GT:     No he wouldn't go by himself. . . .

GT:     No, which *I mean it makes sense that I would have been with him unless I was off that day.*

JK:     Right.

GT:     *But I don't. I just. I don't recall that one.*

(Exb. 1TX, 59-60; Exb. 1, approx. 1:11:40 [emphasis added]).

JK:     Uhm, and then you can't remember how… you can't remember how you knew where she was when you guys picked her up.

GT:     Yeah

JK:     *And you don't remember picking her up.*

GT:     *I don't know. I don't…*

JK:     Trust me…

GT:     Which is weird like I.. I mean do do a lot, but…

JK:     Now that the arrests here are fewer and farther between, I can remember them. Right?

GT:     Yeah

JK:     But back in the day I …

GT:     But that wasn't even that long ago. That was 2019. Unless I'm just getting really shitty with my memory.

JK:     I doubt it. . . .

JK:     Yeah, that that was the only two…two questions I had about that. Like, how it came in and then how you knew where where to find her.

GT:    Oh, yeah . . .

JK:    I just wanted to make sure it wasn't like, Peter directing you.

GT:    Right.

JK:    Somewhere, like hey she's here. She's doing this, like…

GT:    *I don't remember how we came up with that.*

JK:    It is what it is.

GT:    *Like I'm really drawing a blank on this one. . . .*

JK:    Since, uh, the did you talk to him during the the Hunt investigation? Over the watch and the stolen property. That you can recall?

GT:    Just if it was, it was just about, you know, that investigation.

JK:    Just that investigation, okay.

GT:    The only interaction I remember having him, with him, during that investigation was over the watch (UI)

(Exb. 1TX, 59-61; Exb. 1, approx. 1:11:30-1:18:50 [emphasis added]).

Detective Trotter made no attempt to insist upon his original imprecise, knee-jerk assertion in an attempt to mislead or deceive. Rather, while describing his additional involvement he admitted that he really didn't know the extent of his involvement because he had no present recollection, contrary to the allegation in the indictment, considered in a vacuum, that he represented that his only involvement in the Rolex theft investigation was obtaining a statement from Gerace. Instead, the remainder of the same conversation undercut what was charged in the indictment as an absolute and definitive claim. In context, Detective Trotter himself questioned and qualified the accuracy of his earlier statements almost

9

immediately, in the same conversation and did not attempt to rule out additional actions taken by him in the investigation.  Not only did Detective Trotter not make the statement recited in the indictment, taken in context, his responses to the agent's questions evince a lack of intent to make materially false statements limiting the extent of his involvement in the Rolex theft investigation to only obtaining Gerace's statement.

Later statements during the same conversation about the same topic reveal the initial statement for what it was: a hasty guess, not a definitive declaration – certainly no more definitive than the subsequent qualifications by Detective Trotter that he couldn't recall being present at Hunt's arrest or that given the circumstances, he most likely was present at her arrest, thus admitting his participation in the investigation well beyond simply taking a statement from Gerace.

Based on the trial proof viewed in the light most favorable to the prosecution, no rational juror could find beyond a reasonable doubt that Detective Trotter made the statement recited in the indictment and to the extent it could be inferred from other statements, no rational juror could find that that any such statements were knowingly and willfully false, made with an intent to deceive.

### Third allegation: The defendant stated that Gerace had never reached out to him or contacted him regarding the [Rolex watch] investigation

Detective Trotter's initial representation was:

GT:    And he actually never reached out to me about that case at all . . . .

10

515b3a4860bde461

(Exb. 1TX, 46; Exb. 1, approx. 57:27). This was revisited as the agent's questioning

continued:

JK:    Figure out some things. Uhm, did Gerace go and file the report or did he call
you… you said he didn't call …

GT:    No, he never contacted me about….

JK:    …or contact you about it?

GT:    No.

JK:    Uhm, did you ever have contact with him during the investigation. Like, via
phone, email or anything like that? That you can recall.

GT:    *Not that I can recall.* I I mean I vividly remember going over to his house.

JK:    For that victim statement.

GT:    To have him sign that….

JK:    Right..

GT:    Sign that statement, but again it wasn't my case. So I didn't really have any
involvement in it. *I… I truly don't remember*.

(Exb. 1TX, 48; Exb. 1, approx. 58:36 [emphasis added]).  And then:

GT:    Yeah, it was…believe it or not it was actually a surprise that he didn't reach
out to me about that case.

JK:    Prior to?

GT:    Yeah

(Exb. 1TX, 49; Exb. 1, approx. 59:53), and finally

GT: Oh no, like I said…

JK: (UI)

GT: …he never contacted me about that one.

(Exb. 1TX, 58-59; Exb. 1, approx. 1:11:32). And finally:

JK:    Since, uh, the did you talk to him during the the Hunt investigation? Over the watch and the stolen property. That you can recall?

GT:    Just if it was, it was just about, you know, that investigation.

JK:    Just that investigation, okay.

GT:    The only interaction I remember having him, with him, during that investigation was over the watch (UI)

(Exb. 1TX, 61; Exb. 1, approx. 1:18:50-1:19:15).

As with the previous allegation, these initial, definitive-sounding statements were modified and undercut in the balance of the same conversation. Detective Trotter made no attempt to insist upon his original assertion, but instead and throughout the course of the conversation definitively recalled some things but repeatedly admitted to a failure of memory, repeatedly qualified answers, and repeatedly questioned the accuracy of his recall of others (*see e.g.* "I truly don't remember" [Exb. 1TX, 48]; I'm almost positive . . ." [Exb. 1TX, 49]; "I just don't remember . . . what the context was" [Exb. 1TX, 50]; "I don't remember. . . " [Exb. 1TX, 58]; "I'm really drawing a blank on this one . . . " [Exb. 1TX, 61]), including, importantly, the statements alleged in the superseding indictment.

### **Based on the trial proof, the statements alleged were not knowingly and willfully false**

The proof at trial does not evince and in fact, affirmatively contradicts the government's claim that the statements alleged were knowingly and willfully false – i.e.,

515b3a4860bde461

made "purposely and voluntarily. . . with an intention to do something the law forbids, that is, with a bad purpose to disobey the law."

To establish a violation of § 1001 making it a federal crime to make any false or fraudulent statement in any matter within jurisdiction of a federal agency, the government must prove beyond a reasonable doubt that the statement was made with the knowledge of its falsity (*United States v. Yermian*, 468 U.S. 63 [1984]; *United States v. Clifford*, 426 F.Supp. 696 [E.D.N.Y. 1976]).

On a Rule 29 motion, "[w]here . . . the issue is one of intent, the question is whether 'the inferences [in favor of the Government] are sufficiently supported to permit a rational juror to find that th[is] element, like all elements, is established beyond a reasonable doubt'" (*United States v. Workman*, 80 F.3d 688, 699 [2nd Cir. 1996] quoting *United States v. Martinez*, 54 F.3d 1040, 1043 [2nd Cir. 1995]).

Here, the government offered no direct proof at trial of any intent to deceive or mislead government agents by Detective Trotter. To the contrary, he repeatedly expressed concern that his recollection was incomplete and that his statements could be incorrect, rather than asserting that his false statements were true – in sum and substance, "hey, this is what I think but I really don't know."

Leaving aside mere speculation, there was no actual evidence at trial supporting the government's claim that the defendant's statements that were admittedly incorrect were intentionally false made with the intent to deceive or mislead, not simply good faith mistakes.

Rather, the government offered what it claimed was circumstantial proof of the intent to falsify the statements in question: a supposed attempt by Detective Trotter to distance himself from Gerace or minimize his relationship with Gerace. But the government offered no reason why Detective Trotter would seek to do so, or might think he needed to do so.

The government did not contend that any of Detective Trotter's contacts with Gerace were criminal, improper, or unwarranted, or that Gerace otherwise received special treatment or favors from Detective Trotter because of any relationship between himself and Gerace. Rather, the government's witnesses affirmatively disavowed any suggestion that Detective Trotter engaged in any criminal or improper conduct relating to any of his contacts with Gerace. At trial, government witnesses declaimed that any of Detective Trotter's actions or procedures that the government originally viewed as suspicious or unusual were improper such that they could support an inference of an improper relationship that Detective Trotter might seek to distance himself from.

So there was no direct evidence that Detective Trotter knowingly and willfully made false statements and the government did not offer any circumstantial evidence from which a rational fact-finder could conclude beyond a reasonable doubt that the defendant intended to make false statements. Consequently, based on the trial proof, no rational juror could find beyond a reasonable doubt that Detective Trotter, first, knew his statements were false when he made them and second, that he made them purposely with the intention to do something that the law forbids, not mistakenly or accidentally. Thus, the government's proof cannot

14

support its claim that the statements alleged that were factually incorrect, i.e. "false," were knowingly and willfully false, as opposed to mistaken or inadvertent.

**Based on the trial proof, the statements alleged were not material**

"A conviction under section 1001(a)(2) requires a statement that is both false and material (18 U.S.C. § 1001[a][2]). A false statement is material if it has 'a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed'" (*United States v. Aiello*, 118 F.4th 291 [2nd Cir. 2024], citing *United States v. Gaudin*, 515 U.S. 506, 509 [1995] quoting *Kungys v. United States*, 485 U.S. 759, 770 [1988]). The decision at issue need not be a decision to prosecute; a decision to investigate suffices (*see United States v. Jabar*, 19 F.4th 66, 84 [2nd Cir. 2021]).

Still, "evidence of such a decision cannot be purely theoretical and evidence of such a capability to influence must exceed mere metaphysical possibility" (*United States v. Litvak*, 808 F.3d 160, 172-73 [2nd Cir. 2015]). Moreover, the decision to prosecute or investigate must be for a crime other than making a false statement, or "the materiality element would be rendered meaningless" (*id.* at 173). As the Second Circuit reasoned in *Litvak*:

> [E]ven if a rational jury could accept the underlying assertion—that Litvak's misstatements ultimately, though indirectly, frustrated the Treasury's achievement of its investment goals—it may not then infer solely therefrom that those misstatements were capable of influencing a decision of the Treasury. Such speculation is not permitted; rather, for a jury to so conclude, the government must have adduced evidence of an actual decision of the Treasury that was reasonably capable of being influenced by Litvak's misstatements. *See United States v. Gaudin*, 515 U.S. 506, 512 [1995] ["Deciding whether a statement is material requires the determination of ... [the] question[ ] ... what decision was the agency trying to make?"] [internal

quotation marks omitted]). To form the basis of a jury's conclusion, evidence of such a decision cannot be purely theoretical and evidence of such a capability to influence must exceed mere metaphysical possibility.

(*Litvak* at 172-173; *see also United States v. Tao*, 107 F.4th 1179, 1187 [10th Cir. 2024] citing and quoting *Litvak*; *United States v. Camick*, 796 F.3d 1206 [10th Cir. 2015]).

In *Litvak*, "there was no evidence that the statements were capable of influencing one of the banks' decisions . . . although "[d]efendants' misrepresentations certainly concerned a variable that mattered to the banks," the government must offer sufficient evidence that the misstatements were "capable of influencing a decision that the bank was able to make" (*Litvak*, at 174, citing and quoting *United States v. Rigas*, 490 F.3d 208 at 234-236 [2nd Cir. 2007] [internal citations omitted]).  Because the government adduced insufficient evidence for a rational jury to conclude that Litvak's misstatements were reasonably capable of influencing a decision of the Treasury, the Court reversed Litvak's judgments of conviction for fraud against the United States and making false statements (*id.*).

*United States v. Johnson*, 19 F.4th 248 [3rd Cir. 2019] provides further useful analysis on the concept of materiality. After noting that the materiality standard does not require that the statement actually influence the decision-maker, but rather that it only be capable of doing so, the Third Circuit in *Johnson* went on to find that the government failed to satisfy this element of the charge.  The Court held that:

> . . . [T]he problem with the Government's proof is that not every misrepresentation presented to a governmental decisionmaker is inherently "material." A statement might be false, but still incapable of affecting anything, as seen in the Tenth Circuit's decision in *United States v. Camick*,

796 F.3d 1206 [10th Cir. 2015]. There, the defendant posed as his brother and filed a provisional patent application with the U.S. Patent and Trademark Office. The government came calling with an indictment, leading to a conviction for making a false statement. The Tenth Circuit reversed, agreeing there was insufficient evidence of materiality. Camick made a false statement to a governmental decisionmaker. But the government offered no evidence explaining how the statement might have influenced the PTO because Camick filed only a provisional application. Until the PTO reviewed for patentability, there was no decision to influence. Camick's statements were false, but still immaterial.

(*Johnson* at 258-259 [internal citations omitted]).

Information or statements may be relevant, but ultimately still immaterial since "'relevance' and 'materiality' are not synonymous" (*United States v. Rigas*, 490 F.3d 208, 234 [2nd Cir. 2007]). "To be 'relevant' means to relate to the issue. To be 'material' means to have probative weight, i.e., reasonably likely to influence the tribunal in making a determination required to be made" (*id.* quoting *Weinstock v. United States*, 231 F.2d 699, 701 [D.C. Cir. 1956]). "Thus, to prove materiality, the government cannot simply present evidence that a statement was false and the information generally within the purview of the governmental decisionmaker to which it was addressed. Rather, it bears the burden of adducing testimony or other evidence explaining the purpose or use of the statement and some specific way or ways in which the statement might affect a particular decision of the decisionmaking body" (*Johnson* at 259).

In another Tenth Circuit case, *United States v. Finn*, 375 F.3d 1033 [10th Cir. 2004], a U.S. Department of Housing and Urban Development special agent altered an official expense report to cover up an auto accident, which the Tenth Circuit found to be a false

statement, but not a material one under § 1001 (*id.* at 1036-37). The Court went on to find that the statements were relevant to the pertinent governmental decision maker, but because the government failed to explain the purpose or use of case expenditure forms or how an altered report could affect the agency's determination of the propriety of the underlying expense, therefore the government failed to sustain its burden of proving materiality (*id.*).

Falsity and materiality are separate requirements of misrepresentation (*Kungys v. United States*, 485 U.S. 759, 781 [1988]; *see also Gaudin*, 515 U.S. at 509, citing and quoting from *Kungys*, 485 U.S. at 770 on the materiality element of 18 U.S.C. § 1001). In other words, "[d]eliberately using the wrong middle initial . . . is not a felony . . . unless the right middle initial could be important" (*United States v. Kwiat*, 817 F.2d 440, 445 [7th Cir. 1987]). In *Johnson*, the Third Circuit found that this "could be" was missing from the government's evidence; what was required, and lacking, was proof of an actual decision that could have been affected (*Johnson* at 260).

Here, based on the proof at trial, Detective Trotter's statements, even if false, had nothing to do with the government's sex trafficking investigation concerning Peter Gerace. The government took no action and neglected no action as a result of these statements. Based on the trial proof, the defendant's statements not only did not actually affect the investigation, more importantly, they were not capable of affecting the investigation. As in *Johnson*, in this case, the "could be," a critical component of materiality, was wholly lacking.

The government's trial proof revealed its sole purpose for obtaining the statements was to use the content of those statements not in furtherance of any investigatory steps or search for information, but rather, as a tool in litigation: ammunition for cross-examination or witness elimination once Detective Trotter was identified as a trial witness for Gerace, and later, after Gerace's witness list was filed with the defendant's name on it. As revealed by the government's trial proof, the statements themselves were the goal and the government's purpose for questioning Detective Trotter was wholly satisfied by the statements themselves, which were never meant to, and in fact did not based on the proof at trial, affect any other decision made or to be made by the government. In this regard, it is significant that the government had the statements for 15 months and did not claim to take any action following the statements, investigatory or otherwise, until it filed the complaint in this case, five months after Gerace's attorney filed his witness list including Detective Trotter's name (Dkt. 1; 19-cr-227. Dkt. 529).

Based on the government's proof, Detective Trotter's statements were complete for this purpose standing alone and not secured for or material to any purpose beyond cross-examination should Detective Trotter be called by Gerace as a witness at trial. This purpose is revealed by the government's choice to let Detective Jeffrey Gilbert (not on Gerace's witness list) and Phylica Hunt (on the government's witness list) refresh their recollections with reports or documents to permit them to provide accurate answers to the agents' questions, while not offering or allowing Detective Trotter the chance to do the same; the

government sought statements that could be used for cross-examination, not any substantive information conveyed by those statements (all of which the government already possessed).

Because there was no proof offered that Detective Trotter's statements were capable of influencing or affecting the government's actions or investigation, no rational fact-finder could conclude that Detective Trotter's statements were material. After viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could find the essential elements of the crime beyond a reasonable doubt (*United States v. Castelin*, 597 Fed. App'x. 22 [2nd Cir. 2015]); *accord Jackson v. Virginia*, 443 U.S. 307, 319 [1979]; *see also United States v. Cacace*, 796 F.3d 176, 191 [2nd Cir. 2015]; *United States v. Moore*, 54 F.3d 92, 100 [2nd Cir. 1995]).

To defeat a Rule 29 motion, "the government must do more than introduce evidence 'at least as consistent with innocence as with guilt'" (*United States v. Bongiovanni*, 1:19-cr-00227-LJV-MJR, Dkt. 1077 *12 [W.D.N.Y. July 19, 2024] citing *United States v. D'Amato*, 39 F.3d 1249, 1256 [2nd Cir. 1994] quoting *United States v. Mulheren*, 938 F.2d 364, 372 [2nd Cir. 1991]) and where "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence" a reasonable jury would be required to entertain a reasonable doubt" (*id*.). The government has failed to do so here.

Applying this standard, the Court should grant Detective Trotter's motion for a judgment of acquittal pursuant to Rule 29, for the reasons stated above and in his previous motion and arguments to the Court.

Dated: November 7, 2025

Respectfully submitted,

s/Donald M. Thompson

**DONALD M. THOMPSON, ESQ.**
16 West Main Street, Suite 243
Rochester, New York 14614
(585) 423-8290