UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA

       v.

GREGORY TROTTER,                        24-CR-60
                                       DECISION & ORDER
             Defendant.

_____

The defendant, Gregory Trotter, was charged in a one-count superseding indictment with making three false statements to an agency of the United States in violation of 18 U.S.C. § 1001(a)(2).  Docket Item 46.  Following a mistrial due to a deadlocked jury, *see* Docket Item 134, Trotter moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, Docket Items 112 (motion) and 145 (supplement).  After the government responded, Docket Item 147, and Trotter replied, Docket Item 148, this Court heard oral argument and reserved decision.[1]  *See* Docket Item 150.

For the reasons that follow, the Court finds that the government presented sufficient evidence with respect to the third charged statement, and Trotter's motion for a judgment of acquittal on count 1 is therefore denied.  The Court finds, however, that the evidence was insufficient with respect to the first and second charged statements.  If

_____

[1] Following oral argument, the government moved to strike certain excerpts from Trotter's reply brief due to inaccuracies.  Docket Item 151.  The government's motion indicated that Trotter did "not oppose this motion" and, in fact, that his counsel "join[ed] the application to strike from [Trotter]'s reply brief each of the quotes and citations referenced above."  *Id.* at ¶ 9.  The Court therefore grants the motion to strike and has not considered those stricken excerpts in making its decision.

the government opts to retry Trotter, the Court will hear from the parties about any appropriate relief as a result of that finding, including, but not limited to, changes to the jury instructions and special verdict form.

## LEGAL PRINCIPLES

A defendant seeking a judgment of acquittal faces a heavy burden: A court can grant a Rule 29 motion only if no "rational trier of fact could have found the essential elements of the crime established beyond a reasonable doubt." *United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015) (quoting *United States v. Moore*, 54 F.3d 92, 100 (2d Cir. 1995)). Stated another way, "[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)).

In conducting its analysis, the Court "must view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (quoting *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017)). That being said, "if the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (internal quotation marks omitted).

### DISCUSSION[2]

"[I]n order to secure a conviction under [section] 1001(a)(2), the [g]overnment must prove that a defendant (1) knowingly and willfully, (2) made a materially false, fictitious, or fraudulent statement, (3) in relation to a matter within the jurisdiction of a department or agency of the United States, (4) with knowledge that it was false or fictitious or fraudulent."  *United States v. Coplan*, 703 F.3d 46, 78 (2d Cir. 2012) (emphasis omitted).  The superseding indictment here charged three allegedly false statements:

> 1. Trotter "denied having contact with [Peter] Gerace [Jr.] after January 2017";
>
> 2. Trotter "stated that his involvement in the investigation into the alleged theft of [Gerace's] Rolex watch was limited to taking a statement from Gerace"; and
>
> 3. Trotter "stated that Gerace had never reached out to him or contacted him regarding the [Rolex watch] investigation."

Docket Item 46 at 3-4.[3]  Trotter allegedly made these statements during a recorded interview with FBI Special Agent Jason Kammeraad on September 30, 2022.  *See id.* at 3; Docket Item 139 (Court Exhibit 6—transcription of recorded conversation).

According to Kammeraad, he interviewed Trotter—an Amherst Police Detective—prior to Gerace's trial on drug-trafficking, sex-trafficking, and corruption charges.  *See* Docket Item 113 at 10-12.  Among other things, Gerace—the owner of Pharaoh's Gentlemen's Club—had been accused of conspiring with a former DEA

---

[2] The Court assumes the reader's familiarity with the factual background and will recount the facts only as necessary to explain its decision.

[3] Page numbers in docket citations refer to ECF pagination.

agent, Joseph Bongiovanni.  *See id.* at 52.  Kammeraad testified that the questions asked of Trotter were significant for several reasons:  "It would be very important for our investigation to know whether or not Peter Gerace had friends in law enforcement, number 1[, and n]umber 2, if Peter Gerace was trying to leverage those friendships in law enforcement, whether it's state, local, or federal, for the wrong reasons."  *Id.* at 11. Kammeraad specifically chose to speak with Trotter because (1) Gerace had listed Trotter as a potential defense witness, and (2) Kammeraad had gotten "some reports that Detective Trotter and Peter Gerace had a relationship, a friendship."  *Id.* at 10-11.

I.    **STATEMENT #1**

Trotter first met Gerace when Trotter was the police officer assigned to handle a domestic dispute between Gerace and Gerace's ex-wife, Katrina Nigro, in 2016.  *See* Docket Item 139 at 22-24.  As noted above, the superseding indictment alleged that Trotter told Kammeraad that he did not have any contact with Gerace after January 2017—that is, when the matter involving the domestic dispute ended.  *See* Docket Item 46 at 3-4.  In support of that allegation, the government relied on a transcript that showed Trotter saying, "I think my last interaction with him was January of 2017."  *See* Docket Item 93-2 at 24.  And when the government presented this case to the grand jury, that presumably was the government's understanding of the statement.

Shortly before trial began, however, the government realized that the transcription was incorrect: in the context of a discussion solely about the domestic dispute, Trotter actually said, "I think my last interaction with *them* was January of 2017."  Docket Item 139 at 24 (emphasis added).  And after Kammeraad responded,

4

"Okay," Trotter continued: "But then *she*, you know, *she* had drama after that, but nothing that I was involved in." *Id.* (emphasis added).

That change was crucial without a doubt. Saying that his last contact with Gerace was in January 2017 might mean exactly that, even if the conversation was about only a specific domestic dispute. But by saying that his last contact with *them* was in January 2017 and following up with an observation about Gerace's ex-wife in connection with the dispute, Trotter must have been referring to contact connected to the dispute. Nevertheless, instead of dropping that allegedly false statement upon discovering the mistake, the government doubled down, presented the statement to the jury, and now invites this Court to conjure up a reading that somehow would plausibly make the statement false. The Court declines that invitation.

The government argues that when Trotter said "they," he "was talking about his interactions with *either* Gerace or Nigro rather than both of them." Docket Item 147 at 7. Because it is undisputed that Trotter had contact with Gerace after January 2017, the government says, the statement that he had no contact with either Gerace or Nigro after 2017 was false. *See id.* And the government contends that Trotter's subsequent statement that "she had drama after that"—which was "specifically commenting on his interactions with Nigro individually"—"supports the inference that in the prior statement," Trotter meant "*either* Gerace or Nigro." *Id.* "[O]therwise," the government posits, Trotter's "comment about Nigro's subsequent interactions with [the Amherst Police Department] would be irrelevant." *Id.*

The government's interpretation might be plausible in a vacuum, but it makes no sense in context. First, as noted above, the subsequent statement about Nigro on

which the government relies could just as easily cut the other way: Trotter does not say that *they* had later drama he was not involved in; he says only that he had no later involvement with *her*.

But what is more, Trotter did not hesitate—minutes later—to tell Kammeraad about several interactions he had with Gerace after January 2017. For example, Trotter talked about attending a barbeque with Gerace in "2018 . . . [o]r, no '17," *id.* at 38-41, 54-55; and whether in 2017 or 2018, an outdoor barbeque in Buffalo would have been months after January. Trotter also told Kammeraad that Trotter took a statement from Gerace about the theft of Gerace's Rolex watch in 2019. *Id.* at 46. In fact, Trotter specifically said that the 2019 statement was the last time he saw Gerace. *See id.* at 49 ("[Q]: And just make sure that I've covered everything. . . . [W]hen . . . was the last time that you either saw or spoke with Peter? [A]: That day at his house in Clarence. [Q]: That's the last time? [A]: I'm almost positive, yeah.").

Reading Trotter's statement in context, the only interpretation that makes any sense is that "them" meant both Gerace and Nigro together—that is, in connection with their domestic dispute. And there is no indication in the record that Trotter's statement about his last interaction with Gerace and Nigro regarding their dispute being in January 2017 was false, let alone knowingly and willfully so. Thus, this Court concludes that no reasonable juror could find Trotter guilty beyond a reasonable doubt with respect to the first charged statement.

## II.    STATEMENTS #2 AND #3

The second and third statements present closer questions. Those statements relate to Trotter's involvement with the Amherst Police Department's investigation into

the theft of Gerace's Rolex watch by Phylicia Hunt and Trotter's contact with Gerace during that investigation.

The relevant portion of the interview is as follows (second charged statements in bold and italics; third charged statements in bold and underlined):

[Jason Kammeraad]:  Okay. Uhm, now I know there was based upon the [Amherst Police] reports, there was a time where a previous ... uh, [Phy]licia Hunt and a Rolex watch?

[Gregory Trotter]:  Oh, yeah. That wasn't my case.

JK:  That wasn't your case?

GT:  No[.]

JK:  Did you work it at all?  Uhm . . .

GT:  Yes[.]

JK:  What was your involvement in that case?  Cuz I thought I did see your name in some of the reports. . . .

GT:  Yeah yeah yeah.  No no no, yeah, but it wasn't my case.

JK:  Gotcha[.]

GT:  It was, uhm, well the guy that I worked with at the time, Jeff Gilbert. He's now retired.

JK: Okay[.]

GT:  Uhm, it was his case.  It was assigned to him.

JK:  Okay[.]

GT:  Uh, ***my involvement in that was we had to go to Peter's house and have him sign a victim statement.***

JK:  Okay. Did, uhm, when that case . . .

GT:  And **<u>he actually never reached out to me about that case at all.</u>**

JK:  He never reached out to you?

GT:  Cuz I think that was in 2019.

7

JK:  Okay[.]

GT:  [Y]eah[.]

JK:  Uhm, did you ever . . . I thought I saw your name on an arrest report of [Phy]licia Hunt. Is that, am I remembering incorrectly?

GT:  So, yeah, what happens is like if we if we work a case together. . . .

JK:  Right[.]

GT:  We'll sign the charges together.

JK:  Okay[.]

GT:  Yeah.

JK:  Alright, uhm, do you remember much about that case?

GT:  There was . . .

JK:  Cuz all I've read is like your guys's reports . . .

GT:  Yeah[.]

JK:  On that . . . uhm, and I know he's had a contentious relationship with [Phy]licia.  Uhm . . .

GT:  Yeah, I know nothing about any of that.

JK:  Okay[.]

. . .

JK:  Figure out some things.  Uhm, did Gerace go and file the report or did he call you . . . you said he didn't call . . .

GT:  **No, he never contacted me about . . .**

JK:  . . . or contact you about it?

GT:  **No.**

JK:  Uhm, **did you ever have contact with [Gerace] during the investigation. Like, via phone, email or anything like that?**  That you can recall.

GT:  **Not that I can recall.**  I I mean I vividly remember going over to his house.

8

JK:  For that victim statement.

GT:  To have him sign that. . . .

JK:  Right . . .

GT:  Sign that statement, but again it wasn't my case.  ***So I didn't really have any involvement in it.***  I . . . I truly don't remember.

JK:  Okay[.]

GT:  But I don't.  I don't know what, uhm, cuz ***Jeff did it all***.  So,

. . .

JK:  Uhm, with regard to uh, I had it written down here and I just want to . . . uhm . . . nope that covered it.  It was just kind of like . . . I knew, I saw, uh, Jeff's name on that . . .

GT:  Yeah[.]

JK:  And I figured it was you guys just working it together.  But, I just had what was your involvement in that case in particular.

GT:  Yeah, it was . . . believe it or not <u>**it was actually a surprise that he didn't reach out to me about that case.**</u>

JK:  Prior to?

GT:  Yeah[.]

JK:  Okay. Uhm . . .

GT:  Jeff's like I got a report from Peter.  I'm like . . .  I just assumed it was something like . . . oh Jesus, what now.

. . .

JK:  Do you remember how . . . Because you didn't have . . . you weren't the case or the, uhm, detective on it, it wasn't your case, but do you remember how the the [Phy]licia Hunt watch story came in?  Did he call[?]

GT:  I think he went to the police station and filed a report.

JK:  Okay, uhm, and you said you went with Jeff Gilbert, right?

GT:  Yeah.

JK:  To arrest her.

GT:  No, I . . . did I go with him to arr . . .  I I . . .

JK:  I can't remember.

GT:  I don't remember.  I think she . . .

JK: It's it's not . . . It's not pertinent.  I'll just . . . I was wondering how . . . the call came in.  I didn't know if if it came in where you say, hey, you know, Greg I've got this issue with another girl . . .

GT:  Oh no, like I said . . .

JK:  [unintelligible].

GT: . . . **<u>he never contacted me about that one.</u>**

JK:  That's that's kinda where I was going with it.  Like I wanted to make sure he didn't feel like he had a direct line into [the Amherst Police Department] . . .

GT:  No.

JK: . . . to where, my boy he'll take care of all the stuff for me.

GT:  And even if he did call me on that one I'd say you have to call patrol and file a police report.

JK:  Uhm.

GT:  Uhm, well now you have me thinking about this.  I don't even remember was she in town?

JK:  I think she was out of town. She was out of . . .

GT: Did she get extradited?

JK:  No, from what I remember from the police reports, uhm, she was staying at somebody's house in like Tonawanda or it was somewhere outside of Amherst.  And you guys went and picked her up.  But I didn't know . . . there was no indication of how you knew where she was to pick her up.

GT:  I honestly don't remember any of that.  I don't even remember picking her up.  Was I there?

JK: I think . . . I think the booking . . . you were . . . your signature's on it. That's the only way I knew your involvement.  That's why I'm asking.  I don't know if it was.  I believe you were some . . . On something for ... some kind of document for booking.  Or maybe I could be wrong . . .

GT:  Then I must have been there.  We, I mean . . .

JK:  Uhm, He would drop . . .

GT:  I truly do not remember going to pick her up.

JK:  But, uhm, Jeff wouldn't have went by himself, right?

GT:  No he wouldn't go by himself.

JK:  Yeah, you guys don't . . .

GT:  No, which I mean it makes sense that I would have been with him unless I was off that day.

JK:  Right.

GT:  But I don't.  I just.  I don't recall that one.

. . .

JK: Uhm, and then you can't remember how . . . you can't remember how you knew where she was when you guys picked her up.

GT: Yeah[.]

JK:  And you don't remember picking her up.

GT:  I don't know. I don't . . .

JK:  Trust me . . .

GT:  Which is weird like I . . . I mean do do a lot, but . . .

JK:  Now that the arrests here are fewer and farther between, I can remember them. Right?

GT:  Yeah[.]

JK:  But back in the day I . . .

GT:  But that wasn't even that long ago.  That was 2019.  Unless I'm just getting really shitty with my memory.

JK:  I doubt it.

JK:  Yeah, that that was the only two . . . two questions I had about that. Like, how it came in and then how you knew where . . . to find her.

GT:  Oh, yeah . . .

JK:  Which I mean . . .

GT:  I don't . . . yeah . . .

JK:  I just wanted to make sure it wasn't like, Peter directing you.

GT:  Right.

JK:  Somewhere, like hey she's here.  She's doing this, like . . .

GT:  I don't remember how we came up with that.

JK:  It is what it is.

GT:  Like I'm really drawing a blank on this one.

JK:  Yeah, uhm, Uh, with regard to that, do you know . . . how did you guys verify or do you remember how Jeff verified that it was his watch?  I know I'm testing you here . . .

GT:  We had . . . I remember we had pictures of the watch from the pawn shop in Vegas.

JK:  Okay[.]

GT:  I wanna say there was identifying features on it, but that . . .

JK:  Did you ever have to take it to Reed's Jen[s]s?  To get verified.  Do you remember that?

GT:  I . . . no. I didn't.

JK:  No?  Okay. Uhm, cuz it was a Rolex watch, right?

GT:  Yeah[.]

JK:  Typically they have the serial numbers identified.  Uhm, thought [unintelligible] somehow . . .  I don't know how I know that.

GT:  Is there something with the band.  The band width.  The Rolex was legit but the band wasn't legit?

JK:  That or that back cover had like initials on it or something like that and then it di[d] . . . and it came back from the pawn shop where it didn't.  Does that ring a bell?  Like they changed the back.  Cuz it had his initials on it[.]

GT:  Oh[.]

JK:  And they had to verify it someplace somehow.

GT:  I I don't . . . I. . .

JK:  It's fuzzy for me too.

Docket Item 139 at 46-48. 58-62 (emphasis added).

With that backdrop, the Court will address the second and third charged

statements in turn.

### A.    Statement that Trotter's Involvement in the Rolex Case Was Limited to Taking a Statement from Gerace

The second statement presents a very close question.  On the one hand, what

Trotter told Kammeraad about the Rolex watch investigation was largely corroborated

by Trotter's police partner, Jeff Gilbert.  For example, Gilbert testified that Gerace's

complaint came in "[t]hrough the normal channel" and was assigned to Gilbert.  Docket

Item 143 at 20.  Consistent with Trotter's statement, *see* Docket Item 139 at 46, Gilbert

said that Trotter "assist[ed]" him "in handling that complaint," Docket Item 143 at 20-21.

When asked, "How did Detective Trotter become involved in assisting you with that

complaint?," Gilbert replied, "I don't remember the exact conversation.  But I'm fairly

certain I would have asked him to -- to join me with the investigation."  *Id.* at 21.  After

having his recollection refreshed about the first steps he took in the investigation, Gilbert

testified:

> I contacted the victim in the case.  We took a statement from the victim.
>
> And I contacted the pawn shop in Las Vegas, spoke to people out there to ascertain if they, in fact, had a watch matching that description in their custody.  And if there was any video or anything that they had should we need that.

> And I believe there was a part in there too of running the suspect that was listed in there through various systems to check backgrounds and stuff like that.

*Id.* at 30.  Gilbert also testified that he communicated with the Las Vegas Police Department about the case.  *See id.* at 39-40.  And Gilbert said that when the Amherst Police Department recovered the watch, Gilbert took pictures of it and took the watch to Reeds Jenss Jewelers in Amherst to open it and look for a serial number.  *Id.* at 42. Finally, as Trotter had acknowledged, *see* Docket Item 139 at 46, Gilbert testified that both he and Trotter signed the criminal complaint, Docket Item 143 at 48-49.

On the other hand, however, Gilbert described some involvement Trotter had in the investigation beyond taking the statement from Gerace.  For example, Trotter ran various reports on Hunt.  *See id.* at 34-37.  Gilbert testified that it was "Trotter who primarily communicated with . . . Gerace."  Docket Item 144 at 15.  Gilbert, accompanied by Trotter, went to have Gerace identify the watch.  Docket Item 143 at 43.  When it came time to arrest Hunt, Gilbert testified that he and Trotter went to her residence on Grand Island.  *Id.*  Perhaps most significantly, Gilbert said that "according to [his] case notes, Detective Trotter made contact with [Gerace] who knew her location."  *Id.*  And Trotter was present when they arrested Hunt, took a statement from her, and transported her back to booking.  *Id.* at 44-46.

Trotter argues (1) that he never clearly stated that the only thing he did in connection with the Rolex investigation was to take a statement, and (2) that he was equivocal and said that he did not remember.  *See* Docket Item 145 at 5-10.  So, Trotter says, there is no proof beyond a reasonable doubt that he was knowingly and willfully untruthful.  *See id.* at 10.

Ultimately, although a very close call, the Court finds that—even drawing all inferences in the government's favor, as it must—there was insufficient evidence for a juror to find beyond a reasonable doubt that Trotter falsely stated knowingly and willfully that "that his involvement in the investigation into the alleged theft of [Gerace's] Rolex watch was limited to taking a statement from Gerace." Docket Item 46 at 3.

For starters, as Trotter observes, he never actually said that taking the statement from Gerace was his only involvement. When first asked, "Did you work [the case] at all?," his reply was an unequivocal "[y]es." Docket Item 139 at 46. Then, when asked what his involvement was, Trotter accurately said that it was Gilbert's case, not Trotter's. *Id.* He then said: "[M]y involvement in that was we had to go to Peter's house and have him sign a victim statement." *Id.* But he never said that his involvement was limited to taking that statement.

Later on, he said "but again it wasn't my case. So I didn't really have any involvement in it." *Id.* at 48. But even that equivocal statement—"didn't really"—is immediately followed by "I . . . I truly don't remember." *Id.* So that also is not a clear declaration that his only involvement was taking the statement.

What is more, and as Trotter observes, he "went on to describe further participation in the investigation: he recalled viewing pictures of the stolen Rolex sent from the pawn shop in Las Vegas where it was found . . . and recalled identifying information about the watch—the band being the wrong size or type." *See* Docket Item 145 at 6. Then, when asked about Hunt's arrest, Trotter responded: "Was I there?" Docket Item 139 at 59. Kammeraad replied that Trotter's signature was on the booking sheet, to which Trotter responded, "[t]hen I must have been there." *Id.* And although

15

Trotter said that he "truly d[id] not remember going to pick her up," he also said, "it makes sense that I would have been with [Gilbert] unless I was off that day." *Id*. at 59-60.

The Court is conscious of its limited role and has given extensive and careful thought to whether the decision on the second statement should be left to a jury. But the Court also has an obligation to ensure that the government does not overstep its authority. And allowing equivocal statements such as these to be prosecuted under section 1001(a)(2) sets a dangerous precedent.

"The purpose of [section] 1001 is to protect the authorized functions of the various governmental departments from any type of misleading or deceptive practice and from the adverse consequences that might result from such deceptive practices." 2 Modern Federal Jury Instructions – Criminal ¶ 36.01 (2026). But that purpose is thwarted—not furthered—by allowing the government to prosecute a witness for ambiguous and equivocal statements cherry-picked from an interview. Rather than promoting a well-functioning government, allowing such charges discourages honest witnesses from speaking with authorities for fear that their words expressing genuine confusion or attempts to remember might be used against them. Simply put, section 1001 does not authorize the government to ensnare witnesses in a game of "gotcha."[4]

---

[4] This prospect is particularly troubling in the context of this case, where, by the government's own admission, "the big impetus to get that interview done was [Gerace's former attorney's] expressing that . . . Trotter would be . . . a very important witness for the defense." Docket Item 119 at 73. Of course, there is nothing wrong with the government seeking to interview a defendant's potential witnesses. But if that interview can then be used to manufacture false statement charges out of ambiguous and equivocal statements, that imperils defendants' rights.

The bottom line is that the lack of an unequivocal statement that Trotter's only involvement was taking the statement from Gerace—coupled with his later descriptions of other involvement and the questions he asked Kammeraad—give at best "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence." *See Glenn*, 312 F.3d at 70 (internal quotation marks omitted). And that is not enough for any juror to find the essential elements of the charge beyond a reasonable doubt with respect to the second charged statement. *See id.*

### B. Statement That Gerace Never Contacted Trotter about the Rolex Investigation

Trotter's repeated statements that Gerace did not contact him about the Rolex watch case are a different story, however. First, unlike the second charged statement in which Trotter equivocated and did not definitively say what the government said he did, Trotter unambiguously—and repeatedly—stated that Gerace had never contacted him about the Rolex investigation. *See* Docket Item 139 at 46-49, 58-62. Those statements were demonstrably false: text messages and phone records admitted at trial proved otherwise. *See* Docket Item 119 at 45-49. Trotter nevertheless argues that the government did not prove beyond a reasonable doubt that those statements were knowingly and willfully false or that they were material. *See* Docket Item 145 at 10-20.

#### 1. Knowingly and Willfully False

On a Rule 29 motion, "[w]here . . . the issue is one of intent, the question is whether 'the inferences [in favor of the government] are sufficiently supported to permit a rational juror to find that th[is] element, like all elements, is established beyond a reasonable doubt.'" *United States v. Workman*, 80 F.3d 688, 699 (2d Cir. 1996) (first

alteration in original) (quoting *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)).  "Although pro[v]ing a declarant's intent poses difficulties, circumstantial evidence, including proof of a motive to falsify, often may serve to convince a reasonable juror beyond a reasonable doubt of a witness'[s] criminal intent."  *United States v. Lighte*, 782 F.2d 367, 373 (2d Cir. 1986) (citing *United States v. Natelli*, 527 F.2d 311, 318 (2d Cir. 1975)).

Trotter argues that "[l]eaving aside mere speculation, there was no actual evidence at trial supporting the government's claim that [his] statements that were admittedly incorrect were intentionally false made with the intent to deceive or mislead, not simply good faith mistakes."  Docket Item 145 at 13.  For example, Trotter notes that the government produced no proof that Trotter in fact had an inappropriate relationship with Gerace or that he did anything other than good police work.  *See id.*  Had the government proven something along those lines, Trotter says, there might have been a reason for him to lie; because there was no such proof, there was no motive.  *See id.*

The government counters that it introduced proof that "Gerace was charged with numerous, serious offenses, including drug offenses, bribing a federal agent, and sex trafficking," and "[t]here was significant media attention surrounding the Gerace and Bongiovanni investigation and court proceedings."  Docket Item 147 at 12.  "From this alone," the government argues, "a rational juror could infer that [Trotter], an [Amherst Police Department] detective, had possible motives to lie, including embarrassment about being associated with Gerace, wanting to avoid scrutiny of his relationship with Gerace, realization that Gerace may have been trying to use him, or something more nefarious."  *Id.*

The question is not whether this Court thinks the government has proven—or can prove—its case beyond a reasonable doubt, nor is it whether the government is likely to find twelve people who might agree that it has sustained its burden of proof. The only question before the Court at this juncture is whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Glenn*, 312 F.3d at 69 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). And drawing all inferences in the government's favor, as it must, the Court agrees with the government that a juror could find that Trotter had a motive to distance himself from Gerace and to conceal that Gerace had contacted him about the Rolex investigation. For purposes of this motion, that is enough. *See Lighte*, 782 F.2d at 373.

Trotter makes very strong arguments about why the better inference is that he simply could not remember. *See* Docket Item 145 at 12. But those are arguments for the jury. And on a Rule 29 motion the Court "must be careful to avoid usurping the role of the jury," *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (quoting *Guadagna*, 183 F.3d at 129), and "may not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury," *id.*

Thus, this Court finds that a reasonable juror could find that the third charged statement was knowingly and willfully false.

### 2. Materiality

That does not end the inquiry, however. Trotter argues that his statements, even if knowingly and willfully false, were not material. *See* Docket Item 145 at 15-20.

"Material" means "*capable of* influencing[] the decision of the decisionmaking body to which [they were] addressed." *United States v. Gaudin*, 515 U.S. 506, 509

(1995) (emphasis added) (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)); *see also United States v. Santiago*, 2014 WL 4827883, at *5 (S.D.N.Y. Sept. 26, 2014) ("The only question is whether the statement was capable of influencing a reasonable decision-maker."). Thus, it does not matter whether the agency knew that the statements were false when they were made, nor does it matter if those responses would not actually have changed the agency's decisions. *See United States v. Jabar*, 19 F.4th 66, 84 (2d Cir. 2021). The question is whether the statements were capable of affecting the investigation.

"Deciding whether a statement is 'material' requires the determination of at least two subsidiary questions of purely historical fact: (a) 'what statement was made?' and (b) 'what decision was the agency trying to make?'" *Gaudin*, 515 U.S. at 512. "The ultimate question: (c) 'whether the statement was material to the decision,' requires applying the legal standard of materiality . . . to these historical facts." *Id.*

To meet its burden, "the government must have adduced evidence of an actual *decision* of the [*agency*] that was reasonably capable of being influenced by [the defendant]'s misstatements." *See United States v. Litvak*, 808 F.3d 160, 172 (2d Cir. 2015). "[E]vidence of such a decision cannot be purely theoretical and evidence of such a capability to influence must exceed mere metaphysical possibility." *Id.* at 172-73. Moreover, "'relevance' and 'materiality' are not synonymous." *Id.* at 174 (quoting *United States v. Rigas*, 490 F.3d 208, 234 (2d Cir. 2007)). "Materiality" means something more. *See id.*

So the question here is whether Trotter's statements about his contact with Gerace in connection with the Rolex investigation were capable of influencing a decision of the FBI.

Trotter argues that his "statements, even if false, had nothing to do with the government's sex[-]trafficking investigation concerning Peter Gerace." Docket Item 145 at 18. "The government took no action and neglected no action as a result of these statements," he says. *Id.* Rather, Trotter argues:

> [t]he government's trial proof revealed its sole purpose for obtaining the statements was to use the content of those statements not in furtherance of any investigatory steps or search for information, but rather, as a tool in litigation: ammunition for cross-examination or witness elimination once Detective Trotter was identified as a trial witness for Gerace, and later, after Gerace's witness list was filed with [Trotter]'s name on it.

*Id.* at 19. Trotter then concludes that "[b]ecause there was no proof offered that [his] statements were capable of influencing or affecting the government's actions or investigation, no rational fact-finder could conclude that [the] statements were material." *Id.* at 20.

The government counters that the FBI was investigating Gerace's contacts and relationship with law enforcement following the revelation about Bongiovanni. *See* Docket Item 147 at 29. "Agent Kammeraad sought to question [Trotter] about his interactions with Gerace," the government asserts, "understand [Trotter]'s involvement in the arrests of Nigro and Hunt, and further investigate whether [Trotter] was providing Gerace with favors or giving him special treatment." *Id.* at 32; *see, e.g.*, Docket Item 113 at 11 (Kammeraad's testifying that "[i]t would be very important for our investigation to know whether or not Peter Gerace had friends in law enforcement" and whether "Gerace was trying to leverage those friendships . . . for the wrong reasons"). Based on

21

that, the government says, Trotter's statements about his relationship with Gerace were *capable* of influencing the FBI.  *See* Docket Item 147 at 32.  This Court agrees.

Contrary to Trotter's assertion that his "statements . . . had nothing to do with the government's sex[-]trafficking investigation concerning . . . Gerace," Docket Item 145 at 18, several agents testified that an important part of the investigation was determining Gerace's reach within law enforcement, *see* Docket Item 113 at 11 (Kammeraad); Docket Item 119 at 16 (Brian Burns); Docket Item 142 at 25 (Curtis Ryan). Misrepresentations about the extent to which Gerace contacted Trotter about the Rolex investigation could, for example, "cause FBI agents to re-direct their investigation" to other witnesses or affect their decisions to "question [other witnesses] differently or more fully."  *See United States v. Smith*, 54 F.4th 755, 769 (4th Cir. 2022) (quoting *United States v. McBane*, 433 F.3d 344, 352 (3d Cir. 2005)).  That is sufficient.  *See id.*

By contrast, in *Litvak*—a Second Circuit case on which Trotter relies—there was "no evidence that [the defendant]'s misstatements were capable of influencing a *decision* of the *Treasury*."  *See* 808 F.3d at 172.  There, the defendant's misstatements were made to several Public-Private Investment Funds ("PPIFs") in which the Treasury was a limited partner.  *See id.*  But the evidence showed that "the PPIFs were deliberately structured in a manner that kept the Treasury away from making buy and sell decisions" and that "the Treasury cast itself as a limited partner in the PPIFs, and retained no authority to tell the investment managers which [residential mortgage-backed securities] to purchase or at what price to transact."  *Id.*  In other words, the Treasury did not have the power to make a decision based on the information.  That obviously was not the case with the FBI here.

22

As Trotter observes, the court in *Litvak* rejected the government's argument that the Treasury's referral of the matter to the special inspector general for investigation demonstrated that the statements were capable of influencing a decision of the Treasury. *See id.* at 173. "[E]very prosecution for making a false statement undoubtedly involves 'decisions' by the government to refer for investigation, investigate, and prosecute the defendant for making the false statement at issue," the court explained. *See id.* "[B]ut the materiality element would be rendered meaningless," the court continued, "if it were sufficient for the government merely to establish the capability of the false statement to influence an agency staffer's, investigator's, or prosecutor's 'decision' to refer for investigation, investigate, or prosecute the defendant for the very statement at issue." *Id.*

Here, however, the facts are different. Here, Trotter's statements were capable of affecting the FBI's decisions in the *Gerace* investigation, not merely in the investigation into whether *Trotter* was being truthful. And for that reason, the statements were material.

\* \* \*

For all those reasons, this Court finds that the government presented sufficient evidence on the third charged statement. The Court therefore denies Trotter's motion for a judgment of acquittal. Whether Trotter *should* be retried as to this statement, however, is a question for a different branch of the government.

**<u>CONCLUSION</u>**

For all those reasons, this Court DENIES Trotter's motion for a judgment of acquittal under Rule 29, Docket Items 112 and 145. As explained above, however, this Court finds that the evidence was sufficient on only one of the three charged statements. If the government opts to retry Trotter, the Court will hear from the parties about any appropriate relief in light of this finding, including, but not limited to, changes to the jury instructions and special verdict form. The Court GRANTS the government's unopposed motion to strike, Docket Item 151. The parties shall contact the Court to schedule a status conference.

SO ORDERED.

Dated:        January 9, 2026
             Buffalo, New York


                                        */s/ Lawrence J. Vilardo*
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE